FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 15, 2019

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RUTH ANN CONDE CHEESMAN, <br>     Plaintiff, <br>     v. <br> PAMELA J. ANDERSON, TABITHA A: SNYDER, MAYRA CUENCA; DCFS AREA ADMINISTRATOR – BERTA NORTON, <br>     Defendants. | No. 1:18-cv-03013-SAB <br> No. 1:18-cv-03224-SAB |
| ROY D. CHEESMAN, <br>     Plaintiff, <br>     v. <br> TABITHA SNYDER, MAYRA CUENCA, PAMELA ANDERSON, BERTA NORTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, CHILDREN'S ADMINISTRATION, <br>     Defendants. | **ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

    Before the Court is Defendant's Motion for Summary Judgment, ECF No. 25. The motion was heard without oral argument. Plaintiffs are representing themselves. Defendants are represented by Assistant Washington Attorney General Jacob E. Brooks.

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 1**

In their Complaints, Plaintiffs are suing social workers who were involved in the decision to remove their children from their home after reports of abuse were made by school officials. Defendants now move for summary judgment on all claims.

## Motion Standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party has the initial burden of showing the absence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 325; *Anderson*, 477 U.S. at 248.

In addition to showing there are no questions of material fact, the moving party must also show that it is entitled to judgment as a matter of law. *Smith v. University of Washington Law School*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim on which the non-moving party has the burden of proof. *Celotex*, 477 U.S. at 323. The non-moving party cannot rely on conclusory allegations alone to create an issue of material fact. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 2**

**Background Facts**

On December 7, 2016, Plaintiffs' daughter, L.C., who was 5 at the time, went to school. She had been absent the day before. At some point in the morning, her teacher, Tia Ross, noticed some puffiness around her eye and some slight bruising on the outer edge. She asked L.C. what happened, and L.C. explained that she fell asleep in the chair and somehow hit the chair. Ms. Ross let it pass. Later that afternoon, Ms. Ross asked her again what happened. At that point, L.C. said, "my Dad hit me and hit my sister… two times and then he felt bad so he put medicine on my eye." Ms. Ross then reported this conversation to the school counselor.

The school counsel then told the principal, John Graf, who told the counselor to call Child Protective Services (CPS). CPS indicated the school needed to decide whether to call law enforcement, given the previous interactions with Plaintiff Roy Cheesman.[1] Mr. Graf eventually called the school resource officer. Mr. Graf also took three pictures of L.C.'s face. In the process he asked L.C., "Oh, Sweetie, what happened to your eye?" She immediately replied, "My dad got angry and hit me." She also mentioned that her big sister had gotten into trouble because she had gotten L.C. some ice. She indicated her dad smacked her big sister for getting the ice.

School officials let L.C.'s father, Plaintiff Roy Cheesman, take her daughter home after school.

The next day, L.C. was interviewed by Detective Jennifer Margheim and CPS Investigator Tabitha Synder. L.C. gave conflicting statements about what happened. At first, she stated she was watching TV and fell asleep and "bumped herself." ECF NO. 40, Ex. C, at 4. Detective Margheim followed up, "You

---

[1] Defendants indicate they knew that Plaintiff Roy Cheesman had a history of yelling at staff and was quick to escalate conflict.

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 3**

bumped yourself? Okay. Can you tell me more about that?" L.C. responded, "Because my dad hit my sister one time and my dad hit me two times and then my sister helped me put ice on my eye." At another point, she stated that she was flipping her chair and she fell and her dad got mad at her. She was asked if she was ever afraid of her dad? And she answered, "Uh—ye…no." Detective Margheim followed up:

Q: Are you sometimes ever afraid of your dad?
A: Yeah.
Q: Yeah? When are you sometimes afraid of your dad?
A: He gets mad and yell at me.
Q: When he gets mad and yells at you?
A: Mmhmm.
Q: Has that happened one time or more than one time?
A: More than one time
Q: Kay. What happens when he gets mad?
A: Um—he comes down.
Q: Okay. What happens when he yells?
A: He um—raising some more at the computers.
Q: Okay. And does anything else happen when he's mad?
A: Um—no.
Q: No? Okay. Has anything ever happened before when he got mad?
A: No.

Later, she explained that he hates it when she flips her chair, but she didn't want to show Detective Margheim how she flips her chair. She said her legs were tired. She said yes when asked if she thought she was going to get into trouble if she showed Detective Margheim how to flip the chair. Questioning continued about her flipping her chair:

Q: Okay. Were you sitting on the chair when your dad hit you?

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** ~ 4

A: Yeah. Uhhuh.

Q: Okay. So you were sitting in your chair and where did your dad hit you at?

A: At my head.

L.C. then proceeded to show Detective Margheim where she was hit. Question continued:

Q: Okay. So you … you told me you were sitting in a chair when your dad hit you on the head. Is that …. Before the chair flipped, when the chair flipped or something else?

A: Um—before the chair tripped.

Q: Okay. So then . . then what happened?

A: He um—he um—he was outside, my dad, because he was taking out my Barbie[2] because my puppy was um—barking because he put my Bar—he put my puppy inside the cage.

Q: Okay, what happened to the chair when your dad hit your head?

A: Um—I don't know.

Q: Okay. Um-what happen . . er—where was your sister at when your dad hit your head?

A: Um—he um—hit me by my sister.

As the interview was wrapping up, L.C. was asked if everything they talked about was the truth. L.C. answered that she didn't know. In following up, L.C. was asked what she was afraid of. She responded, "Of my dad" and explained it was because he yelled at her.

Detectives spoke with L.C.'s older sister, V.C., who was 16 at the time. She stated she did not see how her sister got her black eye. She reported she spends most of her time in her room because her dad gets upset a lot. She said she was scared to go home and was scared she might get hit if she spoke to the police

---

[2] Barbie is the name of L.C.'s puppy.

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 5**

about her dad's anger. She stated her dad becomes angry with all three kids on a daily basis and hits them. She reported her dad hits her in anger at least a couple of times a week. She confirmed that on December 7, 2016, her dad came into her bedroom, was angry at her and her sister, and hit her on the left side of her head. She also stated her dad grabbed L.C. by the top of her head and shook her aggressively.

Detectives also spoke to I.C, who is L.C.'s older brother. He also stated he did not see how L.C. got her black eye. He reported his dad gets angry at the kids frequently but denied that he hit them when he gets angry.

Based on the statements of the children, law enforcement took them into protective custody. Defendant Snyder took the children to Kittitas Valley Healthcare Hospital where they were examined. The doctor examining L.C. made the following observations:

> Patient has no physical findings on exam that is worrisome for physical abuse that can be found on a medical screening exam other than the small amount of ecchymosis surrounding the right periorbital which I cannot state with any medical certainty is related to any specific physical abuse. Further evaluation of the home environment will be left to the caseworkers and CPS.

ECF No. 40, Ex. D.

With respect to the older two children, the doctor concluded there were no physical findings on the exam that were worrisome for physical abuse.

The Department of Social and Health Services (DSHS) convened a Family Team Decision Meeting on December 9, 2016. Plaintiffs participated along with Defendant Mayra Cuenca, Defendant Tabitha Snyder and Defendant Pam Anderson. Ms. Cuenca and Ms. Snyder reported that Plaintiff Roy Cheesman acted in an irrational manner, exhibiting significant mood swings and making inconsistent statements. He admitted to being a habitual marijuana user. At the meeting, DSHS offered Plaintiffs several options, including signing a voluntary

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 6**

placement that would remove the children from their home for 30 days, with the option of extending this up to 90 days if they chose. This would give Plaintiffs time to participate in the recommended services. Plaintiffs signed the voluntary placement agreement, although they maintain they were coerced into signing it. They maintain that Defendants told them it would take longer if they went through the court system, rather than signing the voluntary placement agreement. Plaintiff Ruth Ann Conde Cheesman was also told that the children could be returned to the home if Plaintiff Roy Cheesman would live somewhere else.

DSHS recommended that Plaintiff Roy Cheesman participate in drug and alcohol assessment and treatment, random urinalysis tests, and anger management and domestic violence assessments. He initially agreed to participate and completed a drug and alcohol assessment and drug testing, but he never completed all the services. Plaintiff Ruth Ann Conde Cheesman agreed to participate in non-offender parental counseling.

A second Family Team Decision meeting was held on January 6, 2017. Plaintiff Roy Cheesman had submitted dirty UA's, testing positive for THC. Plaintiff Ruth Ann Conde Cheesman had attended 1 of the 3 scheduled family support meetings. Given the noncompliance with the recommended treatment, DSHS offered Plaintiffs a thirty-day extension on the voluntary placement agreements. They declined the offer and instead asked for a court hearing. In response, DSHS filed dependency petitions in Kittitas County Superior Court concerning Plaintiff's three children, and the children remained in out-of-home placement. Plaintiffs were allowed supervised visitation sessions with his children, but Defendants report that Plaintiff Roy Cheesman would have inappropriate conversations with them.[3]

---

[3] On January 30, 2017, DSHS petitioned the court to suspend Plaintiff Roy Cheesman's visitation with his children due to his increased confrontational and

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 7**

A sheltered care hearing took place on January 12, 2017. At the hearing, the court ordered that all three children remain in out-of-home placement. After Plaintiff Roy Cheesman's visitation was suspended, both Plaintiffs refused to engage in treatment services, except to attend Family Functional Therapy. The provider indicated the Cheesmans did show progress in this area.

On August 17, 2017, the court concluded the dependency fact-finding hearings and dismissed the dependency petition filed by DSHS. The court noted that the DSHS case met the legal requirement to proceed toward dependency and there was sufficient evidence to place the children out of the Cheesman home. It also found that DSHS presented sufficient evidence to prove that Plaintiff Roy Cheesman was not a capable parent; however, there was not sufficient evidence to prove Plaintiff Roy Cheesman committed the assault against his children. The children were returned to the home.

Plaintiffs believe L.C.'s injury was caused either by falling off a chair and hitting a table, but later accused the teacher of injuring or infecting the eye by touching L.C.'s face.

On January 3, 2017, the Kittitas County prosecutor charged Plaintiff Roy Cheesman with one count of Assault of a Child in the Third Degree and one count of Assault in the Fourth Degree – Domestic Violence. The record is not clear as to the outcome of the criminal charges.

## Plaintiffs' Section 1983 Claims

In order to establish a claim under 42 U.S.C. § 1983, Plaintiffs must show that (1) the conduct complained of was committed by a person acting under the color of state law; and (2) the conduct deprived Plaintiffs of a right, privilege, or

---

irrational behavior, his inappropriate conversations during supervised visits and his pending criminal charges. The Court granted DSHS's motion to suspend visitation on February 14, 2017.

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 8**

immunity secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Long v. Cnty. of L.A*, 442 F.3d 1178, 1185 (9th Cir. 2006).

To the extent that Plaintiffs are suing the named state employees in their official capacity, these claims are dismissed, with prejudice. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1980) (holding that neither state nor its officials cited in their official capacities were "persons" under 42 U.S.C. § 1983). Liberally construing Plaintiffs' complaints, the Court reads their Complaints as asserting claims against the individually-named Defendants in their individual capacity. *See Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 925 (9th Cir. 2003).

Moreover, Defendants, as DSHS employees, have quasi-prosecutorial immunity in the context of initiating dependency actions. *See Meyers v. Contra Costa Cty. Dept' of Soc. Servs.*, 812 F.2d 1154, 1155 (9th Cir. 1987). As such, any claims based on Defendants' decision to investigate and initiate dependency proceedings are dismissed, with prejudice.

The Court declines to dismiss this action based on res judicata. The superior court action was dismissed without prejudice. There have been no judicial findings on the merits of Plaintiffs' claims.

18 U.S.C. §§ 241 and 242 are criminal or jurisdictional statutes that provide no private right of action. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Only a federal grand jury or United States attorney may initiate such criminal charges. Accordingly, any claims under 18 U.S.C. §§ 241 and 242 dismissed with prejudice

"Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). Such a right "is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parent and children will not be separated by the state without due process of law except in an emergency." *Id.* "Officials may remove a child from the custody of its parent without prior judicial

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 9**

authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Id.* at 1138.

Here, a reasonable jury would not find that Plaintiffs' due process rights were violated when the children were placed in protective custody. Based on the statements of the children and the inconsistent explanation given for the injury to L.C., a reasonable jury could reach only one conclusion —that an emergency existed that required the children to be placed outside the home on December 8, 2016. Plaintiffs were afforded an opportunity to meet with Defendants the next day and at that meeting, Plaintiffs signed a voluntary placement agreement. Plaintiffs' assertions that they were coerced into signing the agreement is not supported by the record, even construing the facts in the light most favorable to them. A reasonable accommodation was presented that would have permitted the children to remain in the home until Defendants had the opportunity to investigate further, (*i.e.* Plaintiff Roy Cheesman, the parent who was accused of hitting his children out of anger, could have relocated from the family home), but Plaintiffs refused this option. It was reasonable to ask Mr. Cheesman to temporarily live at another residence. Plaintiffs' refusal to have him do so mandated their children be the ones who would need to temporarily live somewhere else. As such, summary judgment is proper because, viewing the evidence in the light most favor to Plaintiffs, it is clear that no reasonable jury could conclude that Plaintiffs' due process rights were violated.

Plaintiffs argue Defendants violated their due process rights when the children were taken to the hospital for an exam. "The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id.* at 1141 (citations omitted). "Barring a reasonable concern that

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~** 10

material physical evidence might dissipate, or that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations." *Id.* (citations omitted). "Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or part of the medical procedure is being conducted). *Id.* at 1142. The Ninth Circuit also recognized that children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations. *Id.* "The interest in family association is particularly compelling at such times, in part because of the possibility that a need to make medical decisions will arise, and in part because of the family's right to be together during such difficult and often traumatic events." *Id.* "A state has no interest whatever in protecting children from parents unless it has some reasonable evidence that the parent is unfit and the child is in imminent danger." *Id.* at 1142 n.14. "The government may not, consistent with the Constitution, interpose itself between a fit parent and her children simply because of the conduct—real or imagined—of the other parent." *Id.*

Here, genuine issues of fact remain for the jury to decide whether Plaintiffs' constitutional rights were violated when Defendant Snyder took the children to the hospital for a physical examination without judicial authorization and without notice to the parents. Additionally, the Court will entertain a Motion to Appoint Counsel for the minor children to determine whether the Complaint should be amended to add claims for the Cheesman children based on the medical examination. Defendant Snyder is not entitled to qualified immunity on this claim. As set forth above, the law is well-established that judicial authorization for a purely investigatory examination must be obtained after notice and an opportunity to be heard has been furnished to the parents before the state can subject a child to

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 11**

a physical examination. *Id.* at 1141 n.12. Moreover, Defendants were on notice that, at the very least, Plaintiff Ruth Ann Conde Cheesman, the non-offending parent, should have been afforded an opportunity to be present when her children were examined. A jury will have to determine whether there was some urgent medical problem or risk that the evidence would have dissipated that would have prevented Plaintiff Roy Cheesman from being present as well, or that it was impossible to obtain judicial authorization prior to the examination.

It appears Plaintiffs believe that Defendants withheld or concealed the doctor's reports that concluded that no evidence of physical abuse was present, and this doctor's report absolves them of any wrongdoing. As such, Defendants should not have proceeded with the dependency proceedings, given the conclusions in the report. Plaintiffs argue the medical report states "patient has no physical findings on exam that is worrisome for physical abuse." As set forth above, this is not a complete statement regarding L.C. Regardless, a reasonable jury would not read the statements in the medical records and conclude that Defendants fabricated or withheld evidence. Moreover, a reasonable jury would not read the statements in the medical records and conclude this exonerated Plaintiffs. The medical reports were not the only evidence being considered by Defendants. Defendants also heard directly from two of the children that their father routinely hit them.

## Plaintiffs' State Law Claims

Defendants are entitled to statutory immunity from the state tort claims. *See* Wash. Rev. Code § 4.24.595. Plaintiffs have not alleged Defendants committed gross negligence. Because Defendants undertook all of the alleged actions as part of their official duties to investigate the child abuse claims and to place the children into protective custody, they are immune from Plaintiffs' alleged state tort claims: (1) intentional infliction of emotional distress; (2) malicious prosecution; (3) loss of consortium; and (4) libel or slander.

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 12**

Moreover, Plaintiffs' claims based on Wash. Rev. Code § 26.44.030 do not survive. Plaintiffs are not alleging that a mandatory reporter failed in their duty to report child abuse. It is undisputed that this case was not referred to DSHS by a physician.

## Conclusion

Plaintiffs' claim based on Defendant Snyder's action in taking the children to the hospital for a physical examination survives summary judgment. All other claims are dismissed.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment, ECF No. 25, is **GRANTED, in part,** and **DENIED**, in part.

**IT IS SO ORDERED.** The Clerk of Court is directed to enter this Order and forward copies to Plaintiffs and counsel.

**DATED** this 15th day of August 2019.



Stanley A. Bastian
United States District Judge

**ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 13**